I think we're good morning. Good morning, your honors. Thank you, and may it please the court, Amy Hutchinson on behalf of the petitioner. This case presents a challenge to the agency's conclusion that petitioner is not more likely than not to be tortured if removed to Mexico, as well as to the immigration judge's denials of his motions for subpoena and a continuance. Assuming arguendo that petitioner cannot show that the agency overlooked relevant evidence, so moving directly to the subpoena and the continuance, the question is whether in denying petitioner's motion for subpoena and alternative motion for continuance, the IJ abused his discretion and or violated petitioner's due process rights, and that petitioner was prejudiced. To reiterate, petitioner filed an unopposed motion to continue on July 7th, 2016, at which time he was detained. That was his first motion to continue. The second motion to continue was filed on September 20th, 2017, mere days before his individual hearing, but based on a recent development in his case, which did require a continuance. The third continuance was filed April 25th, 2018. Regarding the 2017 continuance, on June 6th, 2017, petitioner filed a witness list naming himself, his wife, and a government detective named Detective Carrera who had agreed to testify. On August 1st, he filed a motion for subpoena for two additional agents who he wished to testify on his behalf. On August 21st, the IJ denied the motions for subpoenas with no explanation whatsoever. Then, days before the individual hearing, Detective Carrera notified petitioner's counsel that he could no longer testify. Based on that development, petitioner requested a continuance to submit formal requests pursuant to United States XREL 2E. That motion was granted, this is the second continuance, and formal requests were made in February of 2018, and when counsel did not get a response, again in April of 2018. As petitioner's counsel explained in her motion before the immigration judge, the government normally, at that time, responded to 2E requests and did at least give a declaration. In this case, they did not. So on April 25th, 2018, roughly three weeks before the individual hearing, petitioner filed the third overall motion to continue as an alternative along with a second motion for subpoena which included all three agents. The original included just the two. Petitioner and the alternative motion to continue was filed so that petitioner's counsel could continue to try and follow up with the government and get a response to the 2E request. The IJ denied. Well, apparently the IJ, and I'm trying to be discreet in the way that I say this because I'm aware that cooperation isn't always looked upon in a positive way in certain circles, but it appears that the IJ's findings that your client had worked with a certain agency and that the Sinaloa cartel was threatening to him, apparently that was accepted by the IJ. Why was it unreasonable for the IJ to find that the requested subpoenas were not essential? Because apparently, the way I sort of see this case, and I'm not speaking for my colleagues and we don't conference before we come to oral argument, but certain things don't really appear to be in dispute with the IJ or the BIA about your client's contentions, about your client's relationship and work that your client from a very young age was selling drugs and things that occurred and that he received a certain benefit at some point on a case that was five and a half years and got down to less than a year or whatever. So that all appears to be there. So, but it moves on from there that the Sinaloa cartel that there was evidence that has a horizontal organization and that one subgroup is not fully cognizant of what is going on in other subgroups. So that it was horizontal as opposed to vertical. And so the IJ based on that found that your client could safely relocate to an area in Mexico where the cartel was not dominant. I don't see in the record any, you know, that any opposition on from your part that it wasn't a horizontal occupation. So I kind of look at this in the way that the IJ was there, they see the witnesses, like when you're a trial judge, you see people. And if the IJ had decided that he couldn't be safe and I were reviewing that, I would probably have to defer to that. And then based on hearing the same thing that he could relocate, I kind of see this as a standard of review issue because I'm not actually hearing those witnesses. So I could support either decision and I might've decided it differently, but why isn't that the case here? So I think we're talking potentially about two different things or rather molding some of the issues together. The way I had viewed the case is if we're just looking at the decision itself, whether or not he's more likely than not to be tortured in Mexico, and we're assuming that there was no evidence that was excluded, we're just looking at the evidence in the record, the argument on petitioner's behalf would be that the IJ did, yes, make those findings that it was horizontal, relying on the country conditions in the record. And the things that he cites in the record do say what he says. But there are certain pieces of evidence that are potentially dispositive, or at least if not dispositive, very probative and very relevant that our view is that he did not look at. And some of the evidence that he didn't cite is on the very same page as what he did. So for example, if you'd like some examples, the immigration judge cited that yes, it's horizontal and so some subgroups of the Sinaloa cartel might not know what's happening in the others. But the record also shows that the Sinaloa, oh, and I'm sorry, and that the Sinaloa cartel is predominantly in the Pacific Coast, and only in 17 states. The record also shows that the Sinaloa cartel, yes, a horizontal structure, but it's allied factions frequently working together. They're just in control of different aspects of the drug production. That's at 362, saying that it is multiple leaders. So the Sinaloa cartel is more like a federation with multiple leaders who form something analogous to a board of directors. That's at 367. Can I interrupt? Because I just want to clarify what's going on here. So we have two issues in this case, as I understand it. One is about whether the expert could testify. The other is just your flat out challenge to the cat determination. It sounds like what you're talking about now is just your flat out challenge to the cat determination. Yes, and I think that might've been my confusion to your question, Judge Callahan. It seemed like we were maybe combining the challenge of the cat determination, and then previously had been talking about whether or not evidence was excluded and whether or not the continuance or the subpoena were necessary. The continuance and the subpoena. So let's just start with that. Let's separate for a second. So the subpoena continuance issue, do you have any argument that the experts would have testified to this relocation question that Judge Callahan was asking? So this is, I think the key question here is how do we define what evidence is essential and can we now, with the benefit of hindsight, look back and say, well, they definitely would have testified that because we know that that's what was missing. I think that's a hard call to make. But to a point made in a previous oral argument this morning, we can't predict what the judge is ultimately going to decide. The role of a subpoena is to get evidence that we can't otherwise get that we believe is necessary. And of course, it's not, we think it's necessary isn't the bottom line. It's whether the judge thinks it's necessary or essential. But I guess, so just to follow up on that, though, we would have to say it was an abuse of discretion to deny the continuance or the subpoenas. And if you weren't saying to the judge, these experts are going to testify about relocation, I'm having trouble figuring out how it was an abuse of discretion. So I think the other follow-up question is not just whether it's essential, but how much explanation does a respondent, or sorry, the petitioner need to put in a motion for a subpoena? What he did put is that... That respondent expects that the agents will testify that these TCOs have similarly known reputations for violent responses against individuals who are perceived to represent a threat to the organization who have otherwise harmed the organization. And also, that they were going to elicit testimony about the proper identification of this specific organized crime groups called into question, and some of the specific facts this claim may be difficult to corroborate. So it seems to me the problem is that that discussion in the text of the motion certainly gives rise to the notion that they would have been testifying about these groups and how they're organized and so on. The actual request for a relief is more limited, and it's from that that the IHA and the government seem to say that they weren't going to testify to anything about the nature of the groups. So does that matter that it wasn't... There are two different pieces to this. Yes, so in filing a motion for subpoena, a respondent in removed proceedings does need to say what evidence they hope to elicit. Now, it's not clear how specific they need to be. My argument, though, is that the petitioner did identify that the purpose of the testimony was in part to discuss the nature and extent of their work as an informant, including the extent of his exposure. Now, we did not write in the motion for a subpoena, I will ask specifically, will he face harm everywhere in Mexico, but I don't know that that's what the standard is. I don't think that was required. I think we needed to put the court on notice of what we hope to gain. And again, we don't know in advance what the judge is going to decide, but now that we do know that it all came down to this issue of relocation, I think it's very reasonable to think that a question would have been asked and that would have changed the outcome of the proceedings. Because the relocation question, as the IJ analyzed it, turned on the understanding of how this group operated. That is my understanding, correct. And the motion, at least in part, seems to suggest that that's what they're going to testify to. I agree. And not specifically whether they were horizontal or vertical or anything like that. No, it was more the identification of the groups. But the request for relief, this is what I wonder about. The request for relief is that the court grants or requests a subpoena which orders these agents to provide a factual description of the following, one, two, three, four, five. And that doesn't really include this question of how these groups operate. That's correct. I think it would have to be, and I don't know that the question is exactly how they operate, but whether or not they operate everywhere and whether or not there's somewhere in Mexico that respond, or sorry, excuse me, petitioner could safely relocate. I think it is reasonable to think that in testifying about the extent of petitioner's work as an informant and the extent of his exposure, there would be discussion about whether it's safe to go anywhere, particularly after the petitioner testified that one of the agents told him, do not go back to Mexico under any circumstances. Once the IJ, oh, sorry, go ahead. Once the IJ was thinking about this relocation issue and seems to think that it was okay to deny the continuances because everything in the declaration would have been taken as true and that wasn't about relocation, did you have an opportunity to say to the BIA, wait a second, the expert would have said X about relocation? Because I didn't see anything that was submitted to say that this was missed, but maybe I missed it. I do believe that in the BIA brief, and I have it here, this is gonna be at AR 30. He does, excuse me, the petitioner does say, I'm sorry, let me find it here. This is the brief to the BIA? This is the brief to the BIA, yes. So page 31 of the administrative record. What he says is, I'm looking at the IJ's order, but thus, Mr. Medina-Mendoza requests the BIA remand with instructions for the IJ to issue subpoenas, including testimony why the requested witnesses advised Mr. Medina not to travel to Mexico, which I do believe covers kind of this, I mean, that covers internal relocation. But you never said, like, we want reopening because there's this extra evidence that our expert, I'm not exactly sure what the procedures would be between the IJ and the BIA for you, because I've not done that level, but it seems like there was never a showing that the expert actually would have testified to something that speaks to the gap in what the agency thinks was missing, the gap in your case. And I'm struggling to see how we can say, oh, yes, there was an error here that was harmful, when we don't know that actually any more evidence would have been given. And I think that's the crux of the issue, is we don't know because the evidence didn't get in, and we could never get any evidence from the government without the subpoena. I guess what we're asking is, could you have filed a motion to reopen or a motion for remand with a declaration from, the problem is these people weren't talking to you, I see, so the problem is since they weren't talking to you, you couldn't make any representations about what they would say. That's correct. And just to be clear, the appeal to the- And that's why you needed a subpoena. Okay. The appeal to the BIA was requesting remand so that the subpoenas could be issued. Okay, and so now we just went down the subpoena and continuance route. The other thing that you seemed to be talking about earlier, though, was your direct challenge just to the CAT determination on the current record. And you think we can say the record compels the conclusion that he can't relocate? I think it's a harder sell, but I do think that there's evidence in the record that would be very, very probative that speaks to the exact opposite of what the IJ said. Specifically, the IJ says, well, it's hierarchical, so they don't necessarily communicate with one another. Other evidence in the record says, yes, it's hierarchical, but these are interconnected units and they all answer to the same person and they have this essentially country-wide surveillance network. And also they had some, there's evidence in the record that they have international people in various places where they're not running. The evidence about that they have 17 states is that they control the 17 states. It isn't that they're not physically present. Nobody from them ever goes to the other states. I agree. Would your argument be stronger if your client had not engaged in being a drug dealer for the same people that he's claiming are going to do him in? As opposed to say, a person that just witnessed a crime by the cartel and had never been engaged in that. I can't help but think that that might have weighed a bit on the, he's gotten some benefit already by virtue for, we could say double agenting. My off-the-cuff response would be that I think it would be weaker because if, and just to paraphrase what you said, you're saying that if there wasn't a prior connection with the cartel? Well, I don't think he's the same as someone that has never worked for the cartel and is just a person that's living in Mexico, sees a crime and then that type of thing. I mean, he's a bit tarnished by everything he did by the cartel, then he informed, then he got benefit. And anyway, we've gone two minutes over. So you basically don't have any time, but I'm gonna give you a minute for a rebuttal. Okay.  Thank you. Good morning. Good morning, and may it please the court. Katie Rose Talley on behalf of the respondent. There are two primary claims at issue today. The court's already discussed them both. That's the denial of the deferral under CAT and then the due process claim with respect to the two procedural motions that were denied. And I wanna go ahead and start with the second request for subpoena and third request for a continuance because that's where the petitioner focused today. And as the court noted, the IJ is not legally permitted under the regulations to issue a subpoena unless he first determines that the proposed evidence outlined in the subpoenas is going to be essential. Here, the IJ correctly determines that this evidence was cumulative, not essential. And the record bears that out because the IJ found for the petitioner on all facts that the petitioner told the IJ in the subpoenas, he sought to prove through the law enforcement officer's testimony. I think- As I said before, that's a fair statement with regard to the specific request for relief probably, but not with respect to the motion that preceded it. What they expect the agents to testify to was broader and would seem to encompass some of the issues that turned out to be dispositive. Your Honor, I have two thoughts on that question. So first, if you look at the motion, I think it's page 667 of the record, it does state that he also expects to prove that the cartel has a reputation for violent responses against those who harm the cartel. That is distinct from saying, I'm going to offer evidence about the structure and geographic scope of the cartel and its reach throughout the entire country. So even taking the motion on its face, I don't think that it fairly puts the IJ on notice that he intended to offer evidence about the cartel's geographic reach, dominance, scope, and structure. And for context, we can look to the witness that the petitioner did disclose to testify on this point. If you look at page 249 of the record in his witness list, the petitioner originally gave the IJ, he disclosed an expert witness, Sylvia Longmire, who he said was an expert on the Sinaloa cartel and who would testify specifically as to the cartel's operations throughout Mexico. In fact, the sole basis for the first motion for a continuance was that Ms. Longmire was not going to be able to make the original hearing date. And so that was the basis on which he got a continuance of over a year to present her testimony. He ultimately didn't offer that expert witness to testify about the cartel's operations. And now he can't remedy that after the fact by trying to turn and convert these three law enforcement officers into testimony about something he never put the IJ on notice. And further to that point, I think it might be helpful to think about an alternate universe in which the IJ grants the subpoenas. What would that actually get the petitioner? If you look at all three subpoenas, and they're at pages 621, 623, 625 of the record, they all say that they can be satisfied in lieu of testimony with a simple written declaration as to five facts. Those facts go to the nature, extent, and duration of the petitioner's cooperation with the DEA, his role in the investigations into the cartel, and whether his informant identity became known to anyone in a cartel. Those facts were all found in favor of him by the IJ. So had the IJ granted these subpoenas and he had gotten written declarations from the three law enforcement officers that have facts as to all five of those points, it wouldn't change the bottom line here because those facts were already found in favor of him by the IJ. So turning to the CAT, the direct challenge to the CAT issue. I guess I'm a little bit confused about why the government is not worried that he is, I mean, despite all this, and maybe the continuances could be denied, but it seems pretty likely that he is gonna be tortured in Mexico, right? Like when he's, I guess I'm a little confused why the government wants to send an informant who has helped the government to probably be killed by the cartel. Your Honor, we're not disagreeing with the IJ's determination that had, if petitioner was relocated into the portion of the country that is controlled by the Sinaloa cartel members, that the particular subgroup of the cartel that is targeting him could potentially reach and harm him there. We're not disputing that determination by the IJ, but we do think that the IJ was correct, and that substantial evidence on the record supports his determination, including, I might add, evidence he cites that was submitted by the petitioner, as well as the petitioner's own testimony. That shows both the cartel's geographic reach is limited, and that the specific subgroup targeting him would not necessarily be able to make incursions into territory that is controlled in these other half of the Mexican states by the- Those words about incursions and control, I mean, all they have to do is go there. I mean, they're not controlling the place, but they can go there, and they apparently do go there. I mean, I think the record demonstrates that they don't necessarily stay in the 17 states they control. So, the evidence as to the organization and control history of this group doesn't seem terribly probative of whether they can go from one place in Mexico to another place in Mexico if they're really after this guy. Your Honor, I think there are a couple of points that are- And do you think they would be really after this guy? Your Honor, there are a couple of points that I think are particularly salient here. First, the IJ found, based on record evidence, including petitioner's own testimony, that it is not the entire, that there was not evidence that the entire Sinaloa cartel was aware of this informant and was targeting him. In fact, it was one specific subgroup on which he informed whose drugs were lost in a bus that he assisted with who was targeting him. That was the subgroup that captured his- But I thought that wasn't the only problem. The problem was what he had done to help the American government to put Mexican drug dealers in prison. It wasn't just the specific thing he had done that led to that problem. But the evidence in the record, including in petitioner's own testimony, was that the specific subgroup was after him, the one that lost drugs in the bus where the informant identity was released. That subgroup was the one that kidnapped his father, that made demands that he return to Mexico, ultimately releasing him without that demand being satisfied. This is a rather dramatic record as to what happened, particularly kidnapping the father and all of that. I can appreciate that, Your Honor. But I think if we go back to the record, again, the standard here is that if you look at the record as a whole, it must compel any or all reasonable fact-finders to find for the petitioner or that the IJ erred. That's not true here. The record, there's certainly evidence in the record that supports the IJ's determination. So I think your brief states there is quote, unquote, affirmative evidence that Medina can safely relocate, quote, to areas outside of the Sinaloa cartel's zone of dominance, unquote. So what's the affirmative evidence, or is there actually affirmative evidence that he can safely relocate, or is the agency's finding based on a lack of evidence that he cannot safely relocate? We do think there is affirmative evidence that relocation is possible, Your Honor, and it comes from these twin specific factual findings that were made by the IJ. First, that the cartel's scope is confined predominantly in these 17 states on the Pacific Coast, and that its rivals are the ones who control the other states. And if you look at page 867 of the record, it states that while there have been some brief bloody incursions by these rival sides trying to encroach on each other's territory, that the dominance of the rivals in these other states do not allow for easy travel or easy access to these other states in Mexico. And Your Honor pointed out- Where's the evidence that it doesn't allow for easy travel? I understand that they don't control the drug trafficking, but what affirmative evidence is there that members of the Sinaloa cartel can't go to these other places and shoot somebody? Well, two responses to that, Your Honor. First, we think that the burden of proof to show likelihood of torture remained on Petitioner. So if Petitioner thought it was possible for the specific subgroup of the Sinaloa cartel targeting him to freely travel amongst states that are controlled by the cartel's enemies, the burden was on him to produce that evidence. But if you look at page, I think, 867 of the record is helpful for this. I'm sorry? 867 of the record is helpful for this because it talks about, you know, to the extent that there were incursions, that they were bloody skirmishes attempting to encroach on each other's territory. That doesn't suggest that the Sinaloa cartel may freely walk into- But I assume that's about control of the drug traffic in those areas. That's what they're trying to control. That's not particularly pertinent here. Well, and Your Honor also noted that the Sinaloa cartel has presence internationally in a variety of countries, that it, you know, including in the United States, the record supports that. And yet, when Petitioner was asked, you know, the Sinaloa cartel has presence in the United States, they know you're in Arizona, correct? They haven't been able to find you, correct? His answers to those questions were yes. If you look at pages 213 through 214 of the record, I think also 198 through 200 and 207 through 09 shows that, or sorry, 217 through 218 shows that even though they knew he was in Arizona, they had presence in the U.S., they were not able to locate him. So I think that's an additional testimony from Petitioner himself supporting that he has not shown the specific subgroup of the cartel that is targeting him would be able to locate and harm him in states in Mexico that are controlled by that cartel's rivals. So where's the Petitioner now? A Petitioner is not in ICE custody. That he's what? He is not in ICE custody. No, but is he not in Mexico? I'm not sure. We don't know? Yeah, I do not know, Your Honor, whether he is still in the United States or not. I just know that he's not in our custody. Okay. So I'm curious, again, to just go over about the continuance that was given for a year to get an expert, and what was that specific about, and then they never called an expert? That's right, Your Honor. So the Petitioner early on in the case disclosed a witness list that had an expert witness, Ms. Longmire, who was going to testify as to the operations of the cartel in the country. The first motion for a continuance, which we did not oppose, stated the only basis for the continuance was that Ms. Longmire was not going to be able to make the original hearing date to testify. The IJ granted over a year-long continuance to make sure that they could secure her testimony, but ultimately, they did not present that testimony about the cartel's operations in Mexico. They did not offer Ms. Longmire as a witness. Instead, what you are now hearing in an argument raised for the first time before this Court, that these law enforcement officers who were going to testify about his cooperation and informant activities would have potentially testified about the cartel's operations and geographic scope in Mexico. That's certainly not in the subpoenas. And to Judge Friedland's question earlier to Petitioner's counsel, this was not even an argument that was properly raised before the Board, so it's completely unexhausted and barred by the statutory exhaustion bar. The closest I think you could say that Petitioner gets before the Board is in the brief at page 33 of the record, where Petitioner says that Respondent likely would have inquired if these officers had testified about the cartel's operations. But what the Respondent might have asked these officers had they testified, which they wouldn't have had to under the subpoenas, is not the same as arguing to the Board that they had information relevant to the cartel's operations and geographic scope in Mexico. One question is that this is a CAD claim. The relocation issue is part of the Petitioner's obligation to demonstrate that he was more likely or not to be tortured while in Mexico, but it's only part of it, right? It's not independently required. So what's supposed to happen, as I understand it, is they're supposed to take all of this evidence together. What happened here is that, as I understand it, the IJ basically recognized that there was very good reason for him to fear that these people would like him dead if he got to Mexico. So it relies pretty much only on the relocation question. Can he do that? When there is such strong, I mean, this is an unusually strong case of somebody who cooperated with the federal government a lot and had true reason to think that there were bad people after him. And the IJ didn't really doubt any of that. He just thought they weren't gonna be able to manage it. That's right, Your Honor. And I wanna point out that the IJ did expressly state that he has considered the totality of the testimony and the other- Well, that's what I'm asking, but he really didn't. He really only relied on, he didn't, anywhere in his reasoning, say even despite the fact that there are very strong reasons to think that there are bad people who would like this guy dead and who have some presence in Mexico, I think the likelihood that he's being able to relocate is strong enough to counteract that. He did say that, Your Honor. We would point specifically to page 67 and 68 of the record. Those pages of the IJ's opinions are key for this point. And as this court stated in Cruz v. Bondi, in Sanfrancisco Salazar v. Garland, and recently, just last year, in Edgar G.C. v. Bondi, this court does not stand in the shoes of the IJ and reweigh record evidence. If there's evidence that cuts both ways, even if this court, if it were reviewing it de novo in the first instance, would find the weight more favorable- So where on the record did you say this is? In the IJ's opinion? Yes. Pages 67 through 68 of the record, you see the IJ recognizing that the, explaining that he's considered the totality of the testimony and other record evidence, he recognizes and acknowledges the petitioner's fear and that had he relocated to areas where this particular subgroup of the cartel were dominant and active, there maybe there would be a concern, but that relocation to these other states where the subgroup might not be able, or would not be able to easily reach and harm him, supported a finding that relocation was possible and that he had not met his burden of showing a more likely than not risk of torture. Some of it's at the bottom of 66, I think, but can I ask a question about this exhaustion issue? So I was asking questions that kind of go to exhaustion, but I don't see anything in the government's brief saying that this is not exhausted, and I think exhaustion is claims processing, right? So I don't know that we would reach exhaustion on our own, or can you point me to something in your brief that makes an exhaustion argument? We do make exhaustion arguments at several points in the brief. I know they're in some of the footnotes throughout our brief, and we've- Okay, maybe I missed it because they're in footnotes. Do you remember? You think they're in footnotes in the brief? There were some footnotes in our brief. Our brief is docket 43, I believe. Oh, you're talking, wait, to us? I'm looking at your brief to us. Is that what you're talking about, or are you talking about- Yes, Your Honor. I don't have the specific footnotes top of mind, but I know we've argued throughout that there were several points that were not exhausted or were waived or forfeited. The arguments about the CRS report and the kidnapping, for instance, were waived. We also specifically argue that he did not present- Okay, I see a waiver footnote about asylum. Okay, I'm asking about, so the exhaustion argument that you made a bit earlier, sort of following up on my questions, was about whether the idea that the experts would have testified about relocation, whether that was exhausted to the board. And you're saying somewhere in your brief there's something that does- We do say that he did not raise this argument to the board. Okay, I'll look again. I apologize, Your Honor, for not having that particular page come to mind, but I believe we did say that he did not raise either to the IJ or to the board the argument now that he's saying that these agents could offer testimony for which he was originally going to offer the expert witness. The IJ also said that they may harm him if he returns to the Mexicali region. But in fact, the father's kidnapping was like 800 miles from the Mexicali region. That's right, Your Honor. We don't read that as the IJ saying the only region in Mexico. Well, he also earlier says, he did seem confused about this because he also earlier said something about he was from Mexicali and whatever the name of the other places, as if they were one place, but they're only 800 miles apart. He does acknowledge that the petitioner, I believe, was originally from Mexicali. Of course, the Sinaloa Cartel is headquartered in Culiacan. And the IJ more generally recognized the fear that if he had been relocated to a state in one of the Pacific Coast states in which the Sinaloa Cartel has control, that the specific subgroup of the cartel who was after him might be able to harm him in those states, including Mexicali, not limited to Mexicali. But we know that this group of people involved with Mexicali were able to harm his father 800 miles away. In the cartel stronghold in Culiacan. Yes, but that is still within the area, the states of Mexico in which the Sinaloa Cartel. Yes, but that seems inconsistent with this notion that there were little groups in these various areas that didn't talk to each other. Well, there was also, this goes to a question, Your Honor, I think ultimately shows that the record has evidence that could potentially be read to support both sides, but there's certainly evidence to support the IJ's conclusion. If you look, for instance, at petitioner's own testimony, where he states that the cartel subgroup who captured his father eventually releases his father because they were afraid when a different member of another subgroup of the Sinaloa Cartel reached out and started making inquiries on his father's behalf. And that member of the cartel who inquired on behalf of his father was totally unaware of the petitioner's informant identity. We see that at page 221 of the record. And this subgroup of the cartel apparently feared this other subgroup of the cartel enough to release his father unharmed, all without petitioner ever returning to Mexico. And since his father's kidnapping in early 2015, the testimony was that there had been no harm done to his family. And that's page 177 of the record. So this idea that this specific subgroup- No, unless the court has additional questions, we've taken you substantially over. So I think that we understand your position. Thank you. Thank you. And I'll give the petitioner two minutes for rebuttal. Okay, thank you. I don't think I'll need two minutes. Just very briefly to answer your question. He is in the United States. And then the point I wanted to make is, I believe it was you, Judge Berzon, was asking, well, doesn't it seem like the IJ did just rely on the relocation? And I do believe that that's the case. And as we know from several cases, evidence regarding whether an individual can relocate is relevant, but it's not dispositive. And from Barajas-Romero, the mere possibility of internal relocation is not fatal to eligibility for CAD. And our view is that that's really all he considered. It was, yes, he meets all of these other criteria, but because he could relocate. But can't you also believe that someone would be tortured, but they wouldn't be tortured at a certain location? I mean, those aren't mutually exclusive, right? No, absolutely. That's correct. Nothing further. Thank you. All right, thank you both for your argument. This matter will stand submitted.
judges: BERZON, CALLAHAN, FRIEDLAND